IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,

v.

CASE NO. 1:14-cr-1-MW-GRJ

SAMUEL J. CUSUMANO, JR.,
_____/

## **REPORT AND RECOMMENDATION**

This matter is before the Court on the Order Referring Case to

Magistrate Judge. ECF. No. 77. The District Judge referred this case to me

to conduct a hearing and then to issue a report and recommendation as to

the amount of the loss and the amount of restitution owed by Defendant.

As directed by the Court the government filed a statement of its

position with regard to the amount of restitution and the amount of loss.

ECF No. 84.  Defendant filed his statement. ECF No. 86.  On December 8,

2015 the Court conducted an evidentiary hearing. The government was

represented by AUSA Gregory P. McMahon. The Defendant appeared on

his own behalf.[1]  As detailed below, the Court recommends that the

---

[1] After conducting a *Faretta* hearing on November 18, 2015 the Court on
November 19, 2015 entered an order granting Defendant's request to waive counsel
and represent himself. ECF No. 90.

amount of loss to be used in calculating Defendant's sentence is $8,165,996.40 and the amount of restitution owed is $7,836,483.74.

## I.  INTRODUCTION

On June 24, 2015 Defendant entered a guilty plea to wire fraud in violation of 18 U.S.C. § 1343 as charged in Count One of the Indictment. The guilty plea was accepted by the District Judge on June 25, 2015.[2] Sentencing is scheduled for February 22, 2016.

Sentencing for fraud offenses is based upon the advisory sentencing guidelines codified in § 2B1.1 of the United States Sentencing Guidelines Manual. *U.S. SENTENCING GUIDELINES MANUAL* § 2B1.1 (U.S. SENTENCING COMM'N Nov. 15, 2015.)("U.S.S.G.") Under § 2B1.1(b)(1) of the U.S.S.G. the Court is required to increase the base offense level depending upon the greatest amount of the loss incurred. Accordingly, because the amount of loss is a determining factor in calculating the specific offense characteristics the matter was referred to me to conduct an evidentiary hearing to determine the amount of loss attributable to Defendant. I was also requested to determine the amount of restitution

---

[2] Defendant's Motion to Withdraw Plea of Guilty was denied by the Court on November 25, 2015. ECF No. 95.

owed to the victims and to make a recommendation as to the amount of restitution Defendant should be ordered to pay.

The government says that the amount of loss attributable to the Defendant is the difference between the total amount Storehouse Credit Union ("SHCU") members deposited/contributed and the combined total of distributions SHCU members received plus the amount the Board of Directors of SHCU was able to recover. The government says that in addition to this amount there is an additional amount that Defendant attempted to embezzle, which also should be included as an intended loss.

The Defendant, on the other hand, says that he should not be held responsible for trading losses, which he says were the result of market conditions. In addition, Defendant says that the Court should rely upon the September 30, 2009 report prepared by SET Revisionsbyra AB ("SET"), a Swedish public accounting firm, retained by the SHCU Board of Directors to review SHCU's financial statements and financial position. Although the numbers Defendant relies upon in the SET report are slightly different from the government's numbers—primarily because the government converted its calculations from Euros to Dollars—the fundamental difference between the parties concerns whether the losses attributable to Defendant should

include trading losses. The government says the loss should include

trading losses while Defendant says it should not.

## II.  EVIDENCE

The government presented the testimony of Jeffrey Brown, the

Internal Revenue Service Criminal Investigator responsible for the

investigation of this case.  Agent Brown has been employed by the IRS

Jacksonville in the Gainesville field office since 2009. He holds a

bachelor's degree in business administration from Westminister College

and upon graduation was employed by Price Waterhouse for two years

and then by an investment firm.

Agent Brown in conjunction with the Federal Bureau of Investigation,

initiated an investigation of SHCU. As part of the investigation Agent Brown

interviewed the Defendant. The Defendant advised Agent Brown that

SHCU was founded in approximately 2007 under Swedish law. SHCU was

formed as a Swedish credit union. SHCU began taking deposits in April

2007 and continued operating until August-September 2009 at which time

the Defendant resigned from the Board of Directors. Defendant resigned

from the Board because the SHCU members had been asking for

withdrawals of loans that SHCU could not pay because there were

significant undisclosed losses.

According to Agent Brown, Defendant insisted that the withdrawals by  members should be characterized as loans and not as distributions. Agent Brown testified that based upon his training and experience the payments to members were not loans but were distributions because the loans did not have repayment schedules, there was no interest charged and there was no evidence that any members, who received payments, repaid the loans.

A large portion of the undisclosed losses occurred during the financial crisis in October 2008, during which time SHCU incurred approximately $3M dollars in losses from foreign currency trading transactions. Foreign currency trading was the sole method of investing Defendant utilized to generate return on the investments the SHCU investors had made.

As part of Agent Brown's investigation of SHCU and the Defendant, Agent Brown listened to approximately twelve to fifteen webinars presented by Defendant to SHCU investors.  In the webinars Defendant represented to SHCU investors that investors would receive a return of 5.6% on a monthly basis. Notably, in the webinars the Defendant discussed and

acknowledged the recession in the world economy and represented that investors in SHCU would be able to take advantage of the market "ups and downs," which would enable SHCU to generate returns of 5.6% on a monthly basis despite recessionary market conditions.

The Defendant formulated the strategies and made the decisions for the foreign currency trades based upon reference bulletin board newsletters and a currency trading website.  Although Defendant represented in a webinar that he used professional currency traders, Agent Brown testified that he found no evidence that Defendant utilized professional currency traders.

The Defendant was the Chairman of the SHCU Board of Directors. Defendant told Agent Brown during his interview that Defendant handled all of the day-to-day transactions of SHCU and that the other members of the Board were "figure-head" directors, who had no day-to-day involvement in SHCU. Defendant had sole signature authority over all of the trading and bank accounts of SHCU until approximately September 2009 when the Board of Directors took over control of SHCU from Defendant.

Among the records maintained by SHCU was banking software called "My Share," which was a platform for providing each member with a

monthly statement depicting how much the member had deposited, how much had been withdrawn and how much the account had earned for the particular period of time covered by the statement. Each member had access to their My Share account through a pin number.

Defendant told Agent Brown he was entitled to compensation as an investor just like any other member based upon the profits distributed through his member account.  Based upon Agent Brown's review of the financial records the only investment he uncovered made by Defendant was a $2,000.00 deposit into SHCU's bank account at Federal Bank of the Middle East. (FBME.")

The FBME was SHCU's main bank, and until March 2009, it was the bank that received all contributions by members and the bank from where all distributions were paid to members. The records from the FBME were the primary banking records Agent Brown utilized in calculating the amount of loss attributable to Defendant.

In addition to the FBME bank records, Agent Brown also reviewed the accounts from FXCM, one of SHCU's primary trading accounts, a trading account from "Options Express" and banking records from

Washington Mutual Bank.[3]  The JP Morgan account was in the name of

Vital Management, a company owned and controlled by Defendant. This

account was used by Defendant to facilitate distributions and contributions

by members after FBME would no longer service SHCU.

One of the key pieces of evidence provided to Agent Brown was the

report of the financial review performed by the Swedish public accounting

firm, SET.

Based upon Agent Brown's review and analysis of these records he

attempted to corroborate the information by comparing the various records.

For example, Agent Brown reviewed the My Share accounts of each

member with the bank records to corroborate the deposits and withdrawals

by each member. Agent Brown testified that while these records did not

correlate exactly they were extremely close. According to Agent Brown the

slight differences are due to currency conversions. Rather than calculating

the daily exchange rate for each trade, deposit or withdrawal—which would

have been a Herculean task—Agent Brown calculated an average

exchange rate for Dollars and Euros based upon the historical weekly

---

[3] Washington Mutual Bank was taken over by JP Morgan and will be referred to as "JP Morgan" account.

exchange rate data covering the relevant time period,[4] which he calculated

was 1.4%. Agent Brown utilized this exchange rate for all of his

calculations.

Agent Brown prepared a chart detailing his calculations of losses

attributable to Defendant.[5] These calculations were made as follows.  He

first determined that the total contributions deposited into the FBME

account and Vital Management account at JP Morgan was

$19,417,972.10. This sum was calculated by adding the total contributions

made in Dollars in the FBME and JP Morgan accounts to the total deposits

made in the FBME account in Euros. The Euro deposits were converted

into Dollars utilizing the 1.4% average exchange rate derived from the

historical data.

Agent Brown then subtracted all of the distributions/loans paid to

members from the FBME account and JP Morgan account. Distributions

paid in Euros were converted to U.S. Dollars in the same manner and

utilizing the same method applied to the deposits. The total

_____

[4]  The historical data Agent Brown utilized was the average weekly BID rates
from April 8, 2007 to March 15, 2009. WWW.oanda.com/currency/historical-rates.
Government Ex. 3.

[5] Government Ex. 1.

distributions/loans paid to members was $9,624,298.50, leaving a deficit of $9,793,673.60.  Agent Brown then subtracted from this sum $1,957,189.86, an amount that was recovered by the Board of Directors in September 2009 after the new Board took control of SHCU. While Agent Brown testified that he was unable to determine what the Board did with the recovered funds, Agent Brown, nonetheless, subtracted this amount from the loss and gave Defendant full credit for these recovered monies. After subtracting the funds recovered by the Board Agent Brown concluded that the total loss was $7,836,483.74.

Agent Brown then added to this figure $329,512.66, which Agent Brown testified, represents an amount that Defendant attempted to embezzle from an account at FXCM, but was stopped by the Board when they learned of Defendant's request to withdraw these funds after the Board had taken over SHCU in September 2009. The total actual and attempted loss therefore equals $8,165,996.40.

Agent Brown also prepared a chart of the monthly statements from the various trading accounts, including the FXCM primary trading account.[6] This chart details on a monthly basis from July 2007 until August 2009 the

---

[6] Government Ex. 2.

beginning balances, the realized gain/loss, the transfers/deposits, the ending balance and the yearly trading gains/losses. Based upon Agent Brown's calculations the total losses (converted to U.S. Dollars) are $3,057,050.42. While the largest losses were incurred in 2008, SHCU also incurred losses in 2007, the year it was formed, as well as in the nine month period it operated in 2009 before it was shut down. According to Agent Brown, Defendant never said in any of the webinars in which he appeared that SHCU had incurred any losses. Instead, Defendant always represented that the trading accounts were growing at the rate of 5.6% minimum on a monthly basis.

The government also introduced an internal document prepared by the new Board of SHCU taken from the My Share accounts for each investor, which identifies the member name, the approximate current value of the member account in U.S. dollars, the account value from the My Share account and then calculates the ratio of current value to equity.[7] Agent Brown testified that the figures from this internal document are very close to his final calculations, the difference being attributable to differences in the exchange rate utilized to make the calculations. Agent

_____

[7] Government Ex. 4.

*Case No: 1:14-cr-1-MW-GRJ*

Brown says this document confirms and corroborates that the method he used is consistent with (although not identical to) SHCU's own calculations as part of its financial review after SHCU was shut down.

Included within the government's calculation of the total losses are the trading losses in the approximate amount of $3M dollars, backdated invoices in the amount of $455,000.00, and funds Defendant took from the Options Express account in the amount of $193,353.72.

With regard to the $455,000.00 in back dated invoices Agent Brown correlated payments made to Vital Management, Defendant's solely owned and controlled company, from February 2007 until September 2009. Although Defendant provided these invoices to the Board at the Board's request, the records evidence that the payments were made to Defendant. Defendant, by his own admission was not entitled to payments for managing SHCU. While Defendant argued in his Statement of Position, ECF No. 86, that this amount should not be included because the government has no proof that he received the monies detailed in the back-dated invoices, the Defendant conceded at the hearing that he had received these monies.

Lastly, the records reflect that Defendant took $193,352.72 from the

Options Express trading account[8] on October 1, 2009, before he resigned and when the company was failing. The money was transferred from an account in Frankfurt, Germany in the name of Options Express to an account in Belize in the name of Storehouse United LLC, an account over which Defendant had sole signatory authority.  Agent Brown testified that Defendant told Agent Brown during an interview that Defendant took the money because "it was a matter of survival."

Defendant did not present any testimonial evidence. The only evidence Defendant introduced was a copy of the SET report.[9]

### III.  DISCUSSION

### A.    Calculation of loss for sentencing guideline purposes under U.S.S.G. § 2B1.1

For sentencing purposes, the loss amount does not need to be precise and may only be a reasonable estimate of the loss based upon the available information. *United States v Woodward*, 459 F. 3d 1078, 1087 (11th Cir. 2006); U.S.S.G. § 2B1.1, cmt. n. 3.(C) (2014).  "Under the

---

[8] The Options Express account was a smaller trading account used for trading options as opposed to foreign currency.

[9] Defendant's Ex. 1.  This report also was included within the back-up records the Government identified as part of its summary exhibits introduced into evidence.

Guidelines, loss more than any other factor, determines the severity of

sentences in fraud cases. The fraud loss table not only drives the

seriousness of the penalty, but it does so with precision, providing

incrementally longer prison terms as the amount of the loss increases."

*United States v Lamonda*, no. 6:05-cr-131-Orl-28UAM, 2008 WL 68744, at

*9 (M.D. Fla. Jan. 2, 2008) This is "ironic because the means of

determining loss is not all precise." *Id.*   Consequently, when considering

the loss caused by fraudulent conduct, the nature of the individual scheme

must determine the correct way to measure the loss. *United States v*

*Orton,* 73 F. 3d 331, 333 (11th Cir. 1996).  In situations, as here, involving a

fraudulent investment scheme, the Court should not reduce the loss by the

money transferred to any individual investor in excess of that investor's

principal investment. *Id.; U.S.S.G.* § 2B1.1, cmt. n. 3(F)(iv).  Like other

sentencing issues that are disputed the Court is required to make the

calculation using a preponderance of the evidence standard. *United States*

*v Sepulveda,* 115 F. 3d 882, 891 (11th Cir. 1997).

The Guidelines define "loss" as "the greater of actual or intended

loss." *United States v Campbell,* 765 F. 3d 1291, 1302 (11th Cir. 2014);

*U.S.S.G.* § 2B1.1 cmt. n. 3(A). Actual loss is defined as the "reasonably

forseeable pecuniary harm that resulted from the offense. *Id.;* cmt. n.

3(A)(I). And where, as here, the defendant returned money to the victims

before the fraud was detected, the loss amount must be reduced by the fair

market value of the returned money. *U.S.S.G.* § 2B1.1 cmt. n. 3(E)(I).

Agent Brown's calculation of the loss attributable to Defendant was

based upon reliable and specific evidence. *United States v. Sepulveda*,

115 F. 3d at 890 (the government's burden "must be satisfied with 'reliable

and specific evidence.'") The loss calculations were derived from SHCU's

own bank records and trading records, which Agent Brown subpoenaed

from the financial entities during the investigation. Additionally, Agent

Brown utilized SHCU's own financial records to corroborate his loss

calculations. For example, Agent Brown used the My Share accounts of

each investor (and the total contributions shown on the My Share

accounts) as a check on his calculations to insure that the numbers

coincided. Although there were small differences in the total numbers the

calculations were fairly close. The reason for the small difference was

because Agent Brown used an average currency exchange rate based

upon historical data rather than a daily exchange rate for each transaction.

And Agent Brown utilized the report prepared by SET to corroborate his

calculations. Again while there were slight differences the total numbers were fairly close, thus verifying the reliability of Agent Brown's loss calculation.

The overall method Agent Brown utilized was appropriate taking into account the fraudulent scheme involved in this case. While there are several approaches to calculating financial loss two of the most commonly used forms of calculation are: (1) the "loss to the losing victims" method; and (2) the defendant's gain or "net gain" method. *United States v. Munoz*, 430 F. 3d 1357, 1370 (11th Cir. 2005)(*citations omitted*) The loss to the losing victims method "focuses on the harm to the victims. The individuals who receive a 'return' or break even on their 'investments' are not victims ... " *Id.* Under the second method the calculation is made by estimating the loss as the net loss to the victims as a group. "Under this method, the defendant will, for sentencing purposes, receive the full benefit of all his return payments." *Id.*

Agent Brown utilized a hybrid of these methods. While his loss calculation focuses upon the loss to the SHCU members by calculating the difference between the total amount the members contributed to SHCU and the total amount SHCU distributed to SHCU members, Agent Brown

gave full credit for all distributions (including distributions paid in full to several investors) and full credit for the funds that were recovered by the Board of SHCU after the Board took over SHCU. Thus, the method utilized by Agent Brown gives the Defendant the full benefit of all monies paid to SHCU investors ($9,624,298.50) as well as full credit for the remaining funds. ($1,957,189.86.)  Accordingly, the Court concludes that the method of loss calculation Agent Brown utilized was a more than reasonable estimate of the loss, given the information available to Agent Brown.

Defendant's primary challenge to the government's loss calculation concerns the approximate $3M in trading losses SHCU incurred. Defendant says that because these trading losses were incurred as a result of market conditions, and were legitimate currency trades, these losses were not reasonably forseeable and, therefore, should not be included in the loss calculation. Defendant's argument is not supported by case law and ignores the undisputed facts in this case.

The undisputed facts demonstrate that Defendant continuously represented to SHCU investors through Webinars— and through providing the My Share accounts to investors— that the investors were earning a minimum return of 5.6% monthly on their investment. Defendant never

wavered from this representation even when significant losses were occurring and even when the world economy in 2008 took a downturn.

As Agent Brown testified, the Defendant continued to represent in Webinars that despite the recession in the world economy investors in SHCU would be able to take advantage of the market "ups and downs," which would enable SHCU to generate returns of 5.6%.

Secondly, the My Share accounts, which SHCU made available to each investor through an individual pin number, included a column for the unrealized gain in each account, calculated at the rate of 5.6%, a method of fraudulently concealing the fact that SHCU, never earned a return of 5.6% but instead incurred losses on almost a monthly basis.[10]  Despite the fact that SHCU was not generating a monthly return of 5.6% Defendant continued to carry out the fraudulent scheme by accepting millions of dollars of deposits from unwitting investors. The loss therefore was a reasonably forseeable pecuniary harm that directly resulted from Defendant's conduct of accepting deposits from investors knowing that

---

[10] Government Ex. 2 details on a monthly basis the losses on each of the SHCU accounts. The largest account was the trading account number 2620204743. The chart demonstrates that SHCU incurred losses of 262,950.14 Euros in 2007, 2,254,158.75 Euros in 2008 and losses of 693,123.32 Euros in the nine months of 2009 that SHCU operated.

SHCU was not generating a monthly return on investment of 5.6%.  While

no doubt Defendant hoped that the currency trades he executed would

produce that type of return, the subjective belief of Defendant has little

relevance to calculating the amount of loss.

The "appropriate test is not whether market factors impacted the

amount of the loss, but whether the market factors and the resulting loss

were reasonably forseeable." *United States v McKanry,* 628 F. 3d 1010,

1019 (8th Cir. 2010). The market factors and the resulting losses were

clearly forseeable.  Defendant knowingly represented to SHCU investors

that they were receiving— and would receive— returns of 5.6%, even if the

market was volatile and took a downturn.  And while SHCU continued to

loss money the Defendant paid monies to himself even though he

represented to investors that he was not being paid.

Consequently, even assuming SHCU losses in some measure were

due to market factors,[11] Defendant is accountable for the losses because

---

[11] While the monthly statements from the trading accounts show that significant losses were incurred in October 2008 during the world wide financial crisis, SHCU also incurred losses both before and after this time period. Government Ex. 2. Additionally, almost all of the currency trades were engineered by Defendant without the assistance or expertise of a professional currency trading expert. Agent Brown testified that despite Defendant's representation in a webinar to SHCU investors that Defendant utilized professional currency traders, Agent Brown found no evidence that Defendant had utilized professional currency traders to advise him with regard to the currency

the losses were incurred directly and forseeably as a consequence of his

actions by investing the member's monies in risky foreign currency trades

during a global financial downturn, while representing to investors that their

investments would continue to generate a monthly return of 5.6%.

Defendant's argument that he should not be held accountable for

losses caused by market factors because he never intended to lose the

investors' monies makes no sense. If that was the case a defendant would

not be accountable for loses in a situation where the defendant steals

money from a bank intending to invest the money in a business and then

return the money to the bank once he has earned enough profit to replace

the stolen money. Defendant's intent is not the measuring stick but rather

the reasonable forseeability of the losses.

Lastly, in addition to the actual losses incurred by the investors, the

government says that the loss calculation should include the $329,512.66

Defendant attempted to embezzle from the FXCM trading account.  Loss is

---

transactions. Defendant instead relied upon newsletters and industry information in
formulating his strategy for the trades. The Defendant only has a high school diploma
and no significant prior experience in foreign currency trading. Thus, it is debatable
whether the losses were the result of market conditions or rather were the result of
Defendant's complete lack of experience in and knowledge of trading foreign currencies
in a recessionary market.

defined as the greater  of "actual loss or intended loss. U.S.S.G. § 2B1.1 cmt. n. 3(A).  Intended loss "(I) means the pecuniary harm that was intended to result from the offense; and (ii) includes intended pecuniary harm that would have been impossible or unlikely to occur ... " U.S.S.G. § 2B1.1 cmt. n. 3(A)(ii); *United States v Grant*, 431 F. 3d 760, 762 (11th Cir. 2005)(district court's inclusion in loss calculation of face value of seized stolen and counterfeit checks as intended loss upheld).

In this case,  Agent Brown testified that the Defendant attempted to withdraw $329,512.66 from the FXCM trading account but was unable to do so because the Board had taken over control of the account.  As evidence of the attempted withdrawal Agent Brown testified that he was provided with two emails concerning the FMCX trading account showing that Defendant attempted twice in September 2009, when SHCU had failed and the Board had taken over control of SHCU, to withdraw all of the funds from this account. Defendant was unsuccessful because the bank refused to transfer the funds. While Defendant never received these monies there is no dispute that he attempted to obtain the monies for his own personal benefit. The situation is no different from a government sting operation where a Defendant attempts to obtain money from a fraud but is stopped

by authorities before he completes the transaction. *See, United States v Schlei*, 122 F. 3d 944, 996 (11th Cir. 1997)(("Consistent with the law of this circuit, the fact that the fraud occurs in connection with a sting operation does not affect the evidence of defendant's intent to defraud others" as part of calculating loss under the Guidelines.) These monies therefore constitute "intended loss" under the Guidelines and should be included in the loss calculation even though the withdrawal did not occur.

In sum, the loss attributable to Defendant is $8,165,996.40. This amount represents the total amount contributed by the SHCU investors minus the sum of the total of the amount distributed to the investors and the amount recovered by the new Board of SHCU plus the amount that Defendant unsuccessfully attempted to embezzle from the FXCM trading account.

At the hearing the Defendant argued that the total amount of the loss should be no more than $119,603.00. Defendant's calculation has no support and suffers from a number of fundamental problems.

Defendant's estimate of loss is derived solely from his misinterpretation and misreading of the numbers included in the SET report. Those numbers are detailed on page 3 of the SET report as part of

a chart titled "Cash Flow analysis April 2007-August/September 2009."[12] The chart (which utilizes Euros) starts with the total cash deposits and then subtracts the total withdrawals, including the withdrawals documented in September 2009 from the My Share account. This part of the loss calculation is identical to Agent Brown's calculations, other than slight differences because Agent Brown's calculation was converted from Euros to Dollars.

Defendant then says that 449,200 Euros should be deducted as administrative expenses. These expenses should not be deducted for two reasons. First, these expenses include 312,380 Euros of fees paid to Defendant through Vital Management for management services. These are the same payments of $455,000.00[13] Agent Brown testified Defendant included in back dated invoices. These payments represented payment to Defendant for management fees that he was not entitled to receive, and fees that he represented to SHCU investors he was not being paid.

Secondly, the other expenses represented in the chart as

---

[12] Defendant's Ex. 1, p. 3.

[13] While there is a small difference in the conversion of 312,380 Euros to $455,000.00, the fact remains that these are the same monies Agent Brown testified were documented in back dated invoices.

administrative expenses (i.e. bank fees, internet services, operational fees, etc.) should not be deducted from the loss calculation because Defendant was convicted of committing a fraudulent scheme through wire fraud. During the plea the Defendant admitted that he "fraudulently induced investors to invest more than $17M in SHCU." The administrative expenses incurred by SHCU, such as bank fees, internet service fees and other operations costs, enabled Defendant to operate the fraudulent scheme. These administrative expenses were paid from the monies invested by the members and enabled Defendant to carry out the fraudulent scheme through the formation and continued operation of SHCU. Where, as here, a defendant's business was used to commit the wire fraud a defendant is not entitled to a credit for the cost of running the business because a defendant should not get a credit for money spent perpetuating the fraud. *United States v Whatley,* 133 F. 3d 601, 606 (8th Cir. 1998). Operating expenses incurred in operating the business of SHCU should not be credited in the loss calculation because"[t]he monies ... spent as part of [a] fraudulent scheme do not become 'legitimate business expenses' simply because other legitimate businesses also incur these expenses." *United States v Campbell*, 765 F. 3d at 1305-06

(operational expenses of business used to carry out fraudulent scheme are not creditable against loss).

Defendant then goes on to deduct from the loss calculation the trading losses detailed on the chart. As explained in detail above, Defendant should not be entitled to deduct trading losses, even if the losses in part resulted from market factors, because those losses were proximately caused by Defendant's conduct in carrying out the fraudulent scheme by investing in foreign currency transactions during a recessionary market.

Lastly, Defendant says that the remaining actual cash depicted on the chart should be deducted.  As the Court explained at the hearing—and as Agent Brown testified— the government has given Defendant a full credit for the monies remaining when the Board took control of SHCU in September 2009.  These monies, thus, already have been taken into account in the loss calculation.[14]

In sum, Defendant's strained loss calculation is based upon the

---

[14] Defendant then says an additional amount of $500,000 should be deducted from the loss calculation based upon evidence in an email that the Board transferred this amount to a third party. Defendant's argument misses the point. This transfer was part of the $1,957,190.00 the Board recovered when it took over SHCU. Thus, the transfer has been included in the full credit given to Defendant.

unsupported premise that he should not be accountable for trading losses

or for administrative expenses and his complete misunderstanding that the

government's loss calculation gives Defendant full credit for the monies

recovered by the Board, regardless of what the monies were used for.

## B.  Restitution

Under the Mandatory Victims Restitution Acct (MVRA"), 18 U.S.C. §

3663A, restitution is mandatory for particular crimes, including those

offenses which involve fraud or deceit. 18 U.S.C. § 3663A(c)(1)(A)(ii).

There must be a "causal relation between the defendant's conduct and the

loss that the [MVRA] requires [the Court] to restore." *United States v*

*Rhodes,* 330 F. 3d 949, 953 (7th Cir. 2003).  Thus, under the MVRA the

Court is required to order restitution for a victim's "actual loss directly and

proximately caused by the defendant's offense of conviction." *United*

*States v McKenzie,* 550 Fed. Appx. 221, 225 (5th Cir. 2013).

There is difference between the calculation of loss under the

Guidelines and restitution. While for sentencing purposes "loss" is defined

as the greater of either the "actual" or the "intended" amount lost due to the

fraud, a restitution award must be based upon the amount of loss actually

caused by the defendant's offense.  *Rhodes* at 953. Restitution focuses on

the victim and the harm proximately caused by the defendant's conduct as opposed to loss for sentencing purposes, which focuses upon the culpability of the defendant. *United States v. Gossi,* 608 F. 3d 574, 580 (9th Cir. 2010).

While restitution serves a different purpose from calculating loss under the Guidelines, the Court, nonetheless, may rely upon a reasonable estimate of the loss in assessing the amount of restitution, just like the Court is permitted to do when calculating loss under the Guidelines. *United States v Futrell,* 209 F. 3d 1286, 1290 (11th Cir. 2000). Thus, the Court is equally entitled to rely upon Agent Brown's calculation of loss in assessing the amount of restitution to award.

The government has identified the investors, who were the victims of Defendant's fraudulent conduct. The victims and the amounts they contributed and were paid is detailed on the chart produced by the government at the hearing.[15] Further, the government's calculation of loss accurately and reliably estimates the actual loss of the SHCU investors proximately caused by Defendant's fraudulent conduct, other than with one exception.

---

[15] Government Ex. 4.

*Case No: 1:14-cr-1-MW-GRJ*

In the government's loss calculation it includes $329,512.66, representing the monies Defendant attempted to withdraw for his benefit from the FXCM trading account after SHCU had failed in September 2009. While this amount properly reflects "intended loss" it does not reflect actual loss because Defendant was unsuccessful in withdrawing the funds. Accordingly, this amount should not be included in any restitution order because restitution under the MVRA is limited to *actual* losses incurred by victims.

Accordingly, the amount of restitution the Court should assess in this case is $7,836,483.74, which represents the amount of the investor's total loss, excluding the monies Defendant unsuccessfully attempted to take for his benefit.

## IV.  CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that:

1.   The Court should calculate Defendant's Guideline sentence under § 2B1.1(b)(1) of the U.S.S.G. based upon a loss attributable to Defendant in the sum of  $8,165,996.40.

2.   The Court should order restitution to the SHCU investors, identified on Government exhibit 4, in the total sum of $7,836,483.74.,

representing the actual losses incurred by the SHCU investors.

**IN CHAMBERS** at Gainesville, Florida this 31ˢᵗ day of December

2015.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636**.